# EXHIBIT 2

Law Offices of Lei, APC
1 Park Plaza. Suite 360
Irvine, CA 92614

# GESTATIONAL SURROGACY CONTRACT

This Gestational Surrogacy Contract (hereinafter "Contract") is entered into by and between **Tronderrica Rogers James** (hereinafter "**Surrogate**" or "Gestational Carrier") and her husband **Travis Travell James** (hereinafter "**Surrogate's Husband**") and **Guojun Xuan** (hereinafter "**Intended Father**") and **Silvia Shasha Zhang** (hereinafter "**Intended Mother**"). The Intended Father and Intended Mother are hereinafter collectively referred to as the "**Intended Parents**." The Surrogate and Surrogate's Husband and the Intended Parents are hereinafter collectively referred to as the "**Parties.**"

## RECITALS

1. The Intended Parents represent that they are an **unmarried** couple over the age of twenty-one (21). The Intended Parents desire to enter into this Contract and intend to have a child or children through assisted reproductive technology by transferring the embryo(s) belonging to the Intended Parents to the uterus of the Surrogate by in vitro fertilization ("IVF").

2. The Surrogate and Surrogate's Husband represent that they are a **married** couple over the age of twenty-one (21). The Surrogate desires to enter into this Contract to assist the Intended Parents to have a child or children by acting as their gestational surrogate pursuant to this gestational surrogacy Contract.

3. The Parties enter into this Contract with the express intent and understanding that the Surrogate and Surrogate's Husband will not have any obligations nor any custodial or any parental rights to any Child that the Surrogate may carry and deliver pursuant to this Contract. It is the understanding that the Intended Parents intend to and will be the legal parents of any Child that the Surrogate may carry and deliver pursuant to this Contract.

4. After careful consideration and consulting with or having an opportunity to consult with independent legal counsel, the Parties acknowledge that gestational surrogacy is a new and unsettled area of law and desire to enter into this Contract voluntarily. The Parties represent that they wish to make their intentions and joint commitments clear in this Contract and provide prompt and certain means to resolve any dispute that may arise in the hope that these intentions expressed in this Contract can be enforced in law. All this is for the purpose to promote the legal legality, security, and welfare of the Child.

5. The Parties expressly understand that this Contract does not constitute as a payment for genetic material, a child, or relinquishment of a child.

Now therefore, in consideration of the mutual promises contained herein and with the intention of being legally bound thereby, the Parties agree as follows:

## I. DEFINITIONS

1. "Agency" in this Contract refers to **Mark Surrogacy** located in El Monte, California. It is expressly understood that the Agency is acting as an agent between the Intended Parents and the Surrogate and Surrogate's Husband, Agency is not a Party to this Contract.

2. "Child" in this Contract refers to any child or children conceived and born by the Surrogate pursuant to this Contract's terms and provisions.

3. "IVF Physician" in this Contract refers to an experienced and licensed medical physician specializing in assisted reproductive technology selected and approved by the Intended Parents. The Intended Parents has chosen **Dr. Ashim Kumar** of **Western Fertility Institute - Encino** (hereinafter the "**Medical Clinic**") located at 16260 Ventura Blvd., # 210, Encino, CA 91436 as their IVF Physician. The Parties may mutually agree and choose a different IVF Physician.

4. "Embryo(s)" in this Contract refers to the embryos clinically created with **an Egg donor's eggs and Intended Father's sperm** via IVF.

5. "Embryo Transfer Procedure" in this Contract refers to the medical procedure performed and supervised by the IVF Physician to transfer the Intended Parents' embryo(s) to the uterus of the Surrogate.

6. "Pregnancy" in this Contract refers to a live pregnancy verified by ultrasound and the IVF Physician as a result of the Embryo Transfer Procedure.

## II. REPRESENTATIONS AND WARRANTIES

1. The Surrogate and Surrogate's Husband's decision to enter into this Contract is a decision made after thorough and careful consideration and without any coercion or duress. The Surrogate and Surrogate's Husband represent that they are entering this Contract voluntarily and freely and the Surrogate warrants to the best of her knowledge that she is capable of conceiving and delivering a normal and healthy Child.



GC____GCH____ IF_[initials]_IM_[initials]_

2. The Surrogate and Surrogate's Husband waive and relinquish any and all interests, rights, responsibilities and claims to the Child born pursuant to this Contract. Additionally, the Surrogate and Surrogate's Husband declare they will not attempt to establish and/or confirm a parent-child relationship with any Child born by the Surrogate pursuant to the terms and provisions of this Contract. The Surrogate and Surrogate's Husband agree to assist the Intended Parents to establish and/or confirm the parent-child relationship with any Child born by the Surrogate under this Contract.

3. The Surrogate represents that to the best of her knowledge, she is not and has never been a registered member of any Native American Indian or Alaskan Indian tribe and she does not have a Certificate of Degree of Indian Blood (also referred to as CDIB). Furthermore, the Surrogate declares that she has no intention of registering as a member of a Native American Indian or Alaskan Indian tribe or obtaining a CDIB. If a Native American Indian or Alaskan Indian tribe tries to claim the Child as a member, the Surrogate explicitly agrees to do all she can to ensure that the Intended Parents are the sole legal parents of the Child.

4. The Surrogate warrants she is not currently receiving any government benefits and aid and she will not submit an application for such benefits and aid during the time of this Contract in the absence of revealing this surrogacy Contract. The Surrogate understands the terms and provisions of this Contract may disqualify her from applying for certain government benefits and aid and the Surrogate is responsible for any and all consequences.

5. The Parties warrant that, to the best of their knowledge, all oral or written statements made to any professional, entity or party related to this Contract are true, correct, and complete, and that they did not and will not purposely falsify or omit any major information related to this Contract. Such statements include but are not limited to the disclosures contained in any written applications and medical questionnaires used in this matter.

6. The Parties hereby represent and warrant that they have not been convicted of any felony in any country and they have no outstanding warrants for his/her arrest in connection with any alleged crime in any country.

## III. PARENTAL RIGHTS AND RESPONSIBILITIES

1. The intention of both Parties is that the Surrogate and Surrogate's Husband shall not have any physical or legal custody, parental rights, or obligations over the Child born to the Intended Parents through the Surrogate under this Contract, and the Intended Parents shall have the legal custody, parental rights, and obligations to the Child born pursuant to this Contract. Notwithstanding the above or any other provisions of this Contract, it is clearly understood and agreed that this Contract shall not be considered as the payment of compensation or any valuable



GC____GCH____ IF____IM____

items to the Surrogate for the termination of any parental rights and/or the placement of the Child with the Intended Parents. The Surrogate and Surrogate's Husband agree that it is in the best interests of the Child to be raised by the Intended Parents and the Intended Parents have full physical and legal custody of the Child. The Surrogate and Surrogate's Husband further agree that they will neither attempt to obtain any custody or visitation rights of the Child, nor will they seek to establish any parental relationship with the Child. The Surrogate and Surrogate's Husband shall cooperate and have the Intended Parents' names to be listed as the parents of the Child on the birth certificate.

2. The Surrogate and her Husband shall sign any necessary documents and cooperate with the parentage establishment between the Intended Parents and the Child. Neither the Surrogate, nor her Husband, shall have any parental, custodial, visitation or any other rights to the Child.

3. The Parties agree that the Intended Parents shall take full custody of the Child upon the birth of the Child and the Intended Parents will be financially, physically, and legally responsible for the Child. The Surrogate and Surrogate's Husband further agree to cooperate with the Intended Parents, Agency, attorneys, and any other related professionals to ensure the establishment of the parental relationship between the Intended Parents and the Child in accordance with Nevada laws. If necessary, the Surrogate and Surrogate's Husband agree to take any lawful action to ensure the Intended Parents be granted as the legal parents of the Child.

4. The Intended Parents agree to assume all responsibilities for any Child born under this Contract regardless of the possibility that the Child may possess congenital abnormalities and/or birth defects and the Intended Parents are aware of such risks.

**IV. PSYCHOLOGICAL SCREENING**

1. Both Parties agree that the Surrogate shall undergo a psychological screening performed by a licensed psychologist and/or psychotherapist specializing in assisted reproduction in order to evaluate and screen the Surrogate psychologically.

2. The Surrogate hereby authorizes and agrees to release psychological and screening reports to Agency, IVF physician and the Intended Parents and the Surrogate expressly waives her confidentiality rights protected by the psychotherapist- patient privilege. The Surrogate authorizes the release of non-identifiable health and/or psychological information related to this Contract on necessary basis.

3. The Surrogate warrants that the evaluating psychologist and/or psychotherapist has informed her of the psychological risks related with this Contract and the Surrogate agrees to assume any and all above mentioned risks. The Surrogate agrees to hold the Intended Parents



GC____GCH____ IF____IM____

harmless from any associated psychological risks.

4. The Intended Parents understand and agree to pay for the Surrogate's psychological evaluation and screening related costs. If necessary, the Surrogate agrees to participate in any additional psychological evaluation or counseling paid for by the Intended Parents.

5. The Surrogate and Surrogate's Husband understand that they have the right to request the Intended Parents to submit to a psychological evaluation by a licensed psychologist and/or psychotherapist and the Surrogate and Surrogate's Husband hereby waive this right.

## V. MEDICAL SCREENING AND EMBRYO TRANSFER PROCEDURE

1. Prior to the Embryo Transfer Procedure, the Surrogate is required to undergo a series of physical examinations, tests, and evaluations requested by the IVF Physician to determine whether the Surrogate is physically and medically qualified to become pregnant and safely gestate the Intended Parents' Child to term.

2. To the best of their knowledge, information, and belief, all Parties state that they are free from any illness or condition that may cause injury or harm to the Child and Gestational Surrogate resulting from their genetic material. Prior to the Embryo Transfer Procedure, the Surrogate and Surrogate's Husband shall undergo screening for sexually transmitted diseases (including HIV and AIDS) required by the IVF Physician for the best interest of all Parties and the Child.

3. By signing this Contract, the Surrogate and Surrogate's Husband expressly waives the doctor-patient privilege during the term of this Agreement to the Intended Parents, Agency, and the IVF Physician when authorizing the release of relevant medical information about the Surrogate resulting from any and all physical examinations, tests, and evaluations related to this gestational surrogacy Contract. The Surrogate and Surrogate's Husband agree to sign any related form or document for the above-mentioned release and authorization.

4. Surrogate agrees to make a full and true disclosure of her medical history (including but not limited to any disease that may affect her performance of this Contract or the health of the child(ren)) to the medical professionals. The Surrogate further agrees to sign the HIPAA release and execute any other required written authorization or waiver to allow the Intended Parents to communicate with all of the medical professionals and personnel and to review the Surrogate's relevant medical records related to the conduct contemplated by this Contract. The Surrogate warrants that she understands the significance of signing the HIPAA release form. The Surrogate hereby waives her doctor-patient privilege. With the Surrogate's waiver of her doctor-patient privilege, the Intended Parents acknowledge and warrant that they shall conduct themselves in an

appropriate manner, not cause interference with the doctor-patient relationship between the Surrogate and her doctor and respect the privacy of the Surrogate.

5. Both Parties agree to comply with all reasonable medical instructions requested by the IVF Physician. The Surrogate agrees to strictly abide by the IVF Physician's schedule and instructions, and to take medications as prescribed by the IVF Physician. One month before and one month after the Embryo Transfer Procedure, the Surrogate shall follow the IVF physician's instruction to take any and all necessary medicine.

6. Subject to the terms of this Contract, the Surrogate agrees to undergo **three (3) Embryo Transfer Procedures within twelve (12) months** from the execution date of this Contract if it is medically advisable, requested by the Intended Parents and any previous Embryo Transfer Procedure could not result in pregnancy and birth of the Child, unless it is otherwise stated in this Contract.

7. The Surrogate warrants that she has consulted or had the opportunity to consult with a medical physician regarding the physical risks related to this Contract and the Surrogate agrees to assume any and all above mentioned risks. The Surrogate agrees to hold the Intended Parents harmless from any associated physical risks related to this Contract.

8. After the Parties consult with the IVF Physician, the number of embryos to be transferred per Embryo Transfer Procedure shall be determined by the Parties. The Parties hereby agree to transfer no more than one**(1) embryo,** , into the uterus of the Surrogate per Embryo Transfer Procedure unless the Parties mutually agree otherwise in writing. Surrogate cannot proceed with embryo transfer until after May 8, 2024.

9. If the Surrogate is unable to achieve viable pregnancy or no successful embryo transfer takes place within twelve (12) months from the execution date of this Contract then this Contract shall terminate automatically. If the Parties mutually agree to continue this Contract after twelve (12) months from the execution date in order to achieve a viable pregnancy with the Surrogate, then a written amendment is needed.

## VI. SURROGATE'S CONDUCT

1. The Surrogate agrees to strictly follow all medical instructions given by the IVF Physician, obstetrician, perinatologist, and other medical professionals, including but not limited to take prescribed medications or non-prescription supplements as required, follow bed rest orders, and cooperate with the IVF Physician's schedule for Embryo Transfer Procedure.



GC____GCH____ IF____IM____

2. The Surrogate shall follow the IVF Physician's advice and order related to birth control and abstinence to avoid the potential possibility of the Surrogate becoming pregnant resulting from sexual intercourse but not the Embryo Transfer Procedure as contemplated in this Contract. The Surrogate further agrees not to have sexual conduct including sexual intercourse during the embryo transfer cycle and any other period as required or recommended by the IVF Physician, obstetrician, perinatologist, and/or other medical professionals. The Surrogate understands the importance of protecting the health of the fetus by refraining from sexual conducts, and agrees that a breach of the sexual abstinence as stated herein shall be considered as a material breach of Surrogate.

3. During the duration of this Contract, the Surrogate shall refrain from getting new tattoos, body piercings, or cosmetic surgeries, and shall not have any needle to skin contact other than for taking medication as expressly authorized in this Contract.

4. The Surrogate shall not expose herself to any harmful substances and chemicals during this Contract. Harmful substances and chemicals include but are not limited to radiation from X-rays, MRIs, and CT scans (except when there is a medical emergency), objects that can transmit infectious diseases or parasites, such as cat litter, animal feces, and toxic chemicals such as insect repellent spray, pesticide, hair dyes, nail polish, and paint.

5. The Surrogate shall not drink any alcoholic beverages during this Contract. The Surrogate shall seek and abide with the IVF Physician, her treating obstetrician and/or perinatologist and/or any other treating medical professionals' advice regarding her consumption of caffeinated food and beverages during this Contract.

6. The Surrogate shall not smoke any tobacco, chew any tobacco products, nor use any vaping, e-cigarettes or any other smoking devices that deliver nicotine. Further, the Surrogate shall not expose herself to any environment containing second-hand smoke. The Surrogate shall make her home smoke-free during her pregnancy contemplated in this Contract for the best interest of the Child.

7. The Surrogate shall not use, inhale, inject or take any recreational drugs, illegal drugs and/or controlled substance under this Contract. The Surrogate agrees not to use any marijuana products or any other products that have tetrahydrocannabinol (THC) as an ingredient.

8. The Surrogate shall not take any prescription, non-prescription or herbal medication that is not prescribed or approved by the IVF Physician, obstetrician, perinatologist, or her treating medical physician. Except in a medical emergency, the Surrogate shall consult with the Intended Parents and her IVF Physician, obstetrician, perinatologist, or her treating medical physician regarding any new medication, and shall only use such medications after receiving written approval from her treating medical physician.



GC____GCH____ IF____IM____

9. The Surrogate shall consult and obtain approval from the IVF Physician, obstetrician, perinatologist, or her treating medical physician before any strenuous fitness activities or exercise. The Surrogate shall not engage in any dangerous sports or activities during her pregnancy, including but not limited to: horseback riding, skiing, snowboarding, rock climbing, surfing, water skiing, ice skating, bungee jumping, dirt biking, weight lifting, roller skating, skateboarding, mountain biking, zip lining, and any other sports or activities that may harm the Surrogate and the Child (except when such sports or activities are approved by the IVF Physician, obstetrician, perinatologist or her treating medical physician in writing).

10. The Surrogate shall maintain a healthy lifestyle and diet plan during her pregnancy, and she shall follow the dietary advice given to her by the IVF Physician, obstetrician, perinatologist, or her treating medical physician. In the event the Intended Parents request the Surrogate to consume foods or supplements that the Surrogate does not usually consume such as organic foods, then the Intended Parents are responsible to pay for or reimburse the cost of such foods or supplements. The Surrogate further agrees to follow the treating physician's advice regarding the consumption of food or supplements, if any.

11. The Surrogate agrees to abide by all recommendations of the IVF Physician regarding Zika virus. The Surrogate agrees and acknowledges that she must disclose to the IVF Physician any travel she has undergone within twelve (12) months before signing this Contract; and, in addition, the Surrogate agrees that she will check the CDC list of Zika affected regions before she travels to anywhere outside of her residential state, and will avoid traveling to any such region until after this contract is terminated. The Surrogate agrees to inform the IVF Physician when Zika virus symptoms are discovered or suspected. The Surrogate warrants that she will take any and all necessary precautions to avoid contacts with mosquitoes, including but not limited to avoiding areas known to have mosquitoes and using mosquito repellents according to the treating medical physician's recommendations.

12. The Surrogate and her Husband agree to follow all recommendations of the treating medical physician regarding the Coronavirus (COVID-19) if any. The Surrogate will accept any new precautions the treating medical physician advised to her if it deemed reasonable. Further, the Surrogate shall inform the treating medical physician and the Agency immediately if she has had close contact with someone who has been diagnosed with COVID-19 or if she begins to have COVID-19 symptoms. In the event the Intended Parents, Agency, or the treating medical physician request the Surrogate to undergo a COVID-19 test, the Surrogate shall submit to such a test at the Intended Parents' cost.

13. The Surrogate agrees to take vaccinations only upon Intended Parents' request and if medically advised by her treating physician.



GC____GCH____ IF____IM____

14. The Surrogate shall not travel outside the United States during the term of this Contract. The Surrogate shall provide notice to the Agency of her out-of-state travel while pregnant and obtain approval from the IVF physician or Obstetrician prior to any airplane travel. The Surrogate shall not travel outside the State of Nevada during or after the twenty-second (**22nd**) week of the gestational pregnancy unless specifically permitted by Intended Parents. The Surrogate further agrees not to travel further than one hundred (100) miles from the hospital in which she expects to deliver after the thirty-fifth (**35th**) gestational week of the pregnancy, unless she has the prior written approval of the IVF Physician, or Obstetrician, or High-Risk Obstetrician, and the Intended Parents. The Surrogate shall not travel to any location that could cause the Surrogate's absence to attend any IVF, laboratory, obstetrician, perinatologist, or other medical appointments. Moreover, prior to the fourteenth (14th) week of gestational pregnancy, the Surrogate further agrees to consult with the treating physician regarding the potential risks prior to her out-of-state travel and shall then follow the treating physician's advice.

15. The Surrogate agrees to follow traffic laws and wear a seatbelt when riding in a vehicle. The Surrogate represents that she will use the vehicle's hands-free system to connect with her phone for direction or phone call purposes so that she is not distracted while driving the vehicle. If the vehicle does not have the hands-free system, the Surrogate warrants that she will not use her cell phone in any way which can distract her from operating the vehicle.

16. The Surrogate promises to keep timely communication with the Agency and the Intended Parents. The Surrogate shall update the Agency and/or the Intended Parents regarding any medical appointment, test, ultrasound, and/or checkup results during the pregnancy via the agreed upon method, such as phone calls, text messages, WeChat, WhatsApp, Skype, FaceTime, Zoom, etc. In case of a medical emergency that is not affecting the Surrogate's health and safety, if the Surrogate is unable to reach the Agency, her attorney, and the Intended Parents after her best efforts, she may make medical decisions that she deem is best for the Child.

17. Before the Surrogate travels outside of the State of Nevada, she shall contact her insurance carrier to determine whether or not the Surrogate's Medical Insurance will provide coverage for the medical and maternity care and treatment of the Surrogate. In the event the Surrogate travels to a location where her medical insurance does not cover her medical treatments, tests, examinations, and other medical care she needs for her pregnancy, the Surrogate shall be financially responsible for any and all costs, fees, and expenses that is not covered by her medical insurance.

18. The Surrogate is currently residing in the state of Nevada and she agrees not to relocate to any other states during this Contract. The Surrogate understands that it is for the best interest of both Parties and the Child for the Child to be born in Nevada.



GC____GCH____ IF____IM____

19. In the event the Surrogate travels and delivers the Child outside of Nevada without receiving permission from the Agency and the Intended Parents, in violation of the terms set forth herein, the Surrogate shall be financially responsible for all related costs, fees, and expenses for the Intended Parents to establish the parental rights with the Child in such state.

20. The Surrogate shall submit to any medical tests or procedures deemed necessary or advisable by the IVF Physician, her obstetrician, and/or her other then-treating physician, or as may be reasonably requested by the Intended Parents and approved by the treating physician, including, but not limited to, cfDNA, Nuchal Translucency Screening Test, Amniocentesis, CVS, and FAS.

21. The Surrogate further agrees to submit to drug, alcohol, marijuana and/or nicotine testing upon the request of the Intended Parents and/or the treating medical Physician requested during this Contract and the Surrogate shall complete the above-mentioned test(s) within forty-eight (48) hours. The Surrogate hereby authorizes the Agency, Intended Parents, and/or IVF Physician to have access to the test results. In the event the Surrogate tests positive for any drug, alcohol, marijuana and/or nicotine, it shall be deemed as a material breach of this Contract.

The Surrogate acknowledges that she understands all the terms and provisions as stated herein under Section VI and she shall comply with all her obligations and responsibilities. In the event the Surrogate violates the terms and provisions in this Section, it will be considered as a material breach of this Contract.

## VII. DELIVERY HOSPITAL AND OBSTETRICIAN

1. The Obstetrician/Gynecologist ("Treating Physician") will be chosen by Surrogate, after consultation with the Intended Parents, with the intention that the Treating Physician is considered a "preferred provider" by the insurance being used in this Agreement for Surrogate's medical care.

2. It is expressly understood and agreed that the delivery shall take place at a licensed in-network hospital, in consultation with and following the recommendation of the Surrogate's Obstetrician. The delivery hospital shall be in-network of the Surrogate's insurance. Surrogate shall be under the care of a licensed and board-certified Obstetrician and the actual delivery must be performed by a licensed and board-certified Obstetrician.

3. In the event of a multiple gestation or should Obstetrician or the IVF Physician determine that the pregnancy is "high risk," or should the Surrogate or the Intended Parents lose confidence

in the Obstetrician, Surrogate shall change to a High-Risk Obstetrician and hospital in-network of the Surrogate's insurance. The High-Risk Obstetrician shall be approved by the Intended Parents.

## VIII. MEDICAL APPOINTMENTS AND LABOR

1. After the Surrogate is confirmed pregnant by fetal heartbeat and throughout the gestational pregnancy, the Surrogate shall communicate with the Intended Parents at least once every two weeks to inform the Intended Parents about any and all medical appointments, examinations, and laboratory test results.

2. The Surrogate shall inform the Intended Parents of any and all scheduled and planned upcoming medical appointments, examinations, laboratory tests, procedures and any other information related to the pregnancy and the Child.

3. In the event the treating physician recommends as medically advisable an induction or cesarean delivery, Surrogate agrees to follow the treating physician's advice and consent to such a procedure. The Surrogate agrees that she attempts to deliver a full-term Child and will not request to induce or deliver earlier than medically recommended by the treating physician.

4. It is required that the Surrogate shall immediately notify the Agency and/or the Intended Parents when she starts to have contractions and/or is in labor. Except for emergency medical situations, the Surrogate's failure to notify the Agency and/or the Intended Parents will constitute a material breach of this Contract. The Surrogate agrees to have the Intended Parents or their representative to be in the delivery room when she is in labor, and the designated person promises to respect the Surrogate's modesty and privacy in the delivery room. However, if only one person is allowed to be present in the delivery room and the Surrogate wishes to have her family member in the delivery room instead of the Intended Parents or their representative, the Intended Parents shall respect her choice and the Surrogate's designated person shall accompany the Surrogate during labor.

## IX. CORD BLOOD

1. If the Intended Parents want to preserve the cord blood upon the Child's birth, the Surrogate agrees to cooperate with all necessary procedures related to preserving the cord blood. The Intended Parents shall be responsible for all costs, fees, expenses, and any other bills associated with the collection, preservation, and storage of the cord blood.

## X. BREAST MILK



GC____GCH____ IF_[initials]_IM_[initials]_

1. The Parties understand that the Surrogate may not be able to provide breast milk after birth. If the Intended Parents request and the Surrogate is physically and psychologically capable, the Surrogate agrees to provide breast milk after birth. The Parties shall mutually agree regarding the period of time that the Surrogate should provide breast milk to the Intended Parents. The Intended Parents' payment to the Surrogate for breast milk is set forth in Exhibit "A."

## XI. ABORTION AND REDUCTION

1. In the event it is in the medical opinion of the treating physician that the Child may have Cleft Lip, Cleft Palate, Down's syndrome, Spinal Bifida, Cerebral Palsy, Dwarfism, missing a limb/limbs, or any other physical, neurological, genetic abnormality, defect or disease which may materially affect the Child's life or life quality, the Surrogate shall undergo an abortion or selective reduction when the treating physician recommends an abortion or selective reduction or when the Intended Parents request the Surrogate to do an abortion or selective reduction. Further, the Surrogate agrees to undergo an abortion or undergo a selective reduction procedure if it is in the medical opinion of the IVF Physician, or Obstetrician, or High-Risk Obstetrician that the Surrogate continuing pregnancy without abortion is or will be faced with a significant threat to her life or there is a risk of significant harm to the physical health of the Surrogate or the Surrogate continuing the multiple pregnancy without a selective reduction procedure would pose a significant health risk to one or more of the developing fetuses or put the entire pregnancy at substantial risk. The Surrogate agrees to undergo any abortion or selective reduction within twenty-four (24) weeks of gestational pregnancy if permitted by law. The Intended Parents may request the Surrogate to travel to another state for abortion if the state of Nevada prohibits abortion or has other restriction regarding abortion during this Contract and the Surrogate agrees to comply with such arrangement.

2. Surrogate agrees to carry two (2) fetuses if the embryo splits.

3. Notwithstanding the above provisions or any provision to the contrary, both Parties should understand that the court may determine that a pregnant woman has the absolute right to abort or not abort any fetus she is carrying and any warrant to the contrary may be unenforceable. In the event the Surrogate chooses to exercise inconsistently with the instructions of the Intended Parents regarding abortion, such action shall constitute a material breach of this Contract. Based on this breach, all compensation and benefits due to Surrogate shall cease. Furthermore, Surrogate shall be responsible for all damages permitted by law, including, but limited to, medical costs, fees, and miscellaneous expenses incurred by Intended Parents for raising a child actually diagnosed with physical, physiological, neurological, or chromosomal disease or abnormality if she violates Section XI.

## XII. CHANGE OF PHYSICIAN AND SECOND OPINION



GC____GCH____ IF____IM____

1. The Parties have a right to obtain a second medical opinion by a physician selected by the Party seeking the second medical opinion, to be paid for by that Party, unless the cost is covered by the medical insurance policy. The Parties agree to cooperate with any testing, examination or medical appointment required by the second physician.

2. In the event the second medical opinion fails to resolve the presenting medical issue, the Parties agree that the decision shall be made by a third physician, mutually selected by the first and second physician, or mutually selected by the Parties. The Parties agree to abide by that third opinion.

## XIII. ASSUMPTION OF RISKS

1. Intended Parents assume the risks that the Embryo Transfer may not result in successful pregnancy or the Surrogate will deliver a normal and healthy Child. It is the responsibility of the Intended Parents to consult with a geneticist as to the risk of such abnormalities and/or defects.

2. The Surrogate acknowledges she has been advised that there may be psychological and/or medical risks associated with her obligations and conducts contemplated in this Contract. The Surrogate agrees to assume any risks of psychological and medical harm that may occur as a result of her performance under this Contract. The Surrogate agrees to hold the Intended Parents harmless from any and all liabilities arising from psychological and medical risks in connection with this Contract. The Intended Parents' responsibility to the Surrogate should she suffer any harm, become disabled or die from any and all psychological or medical injury is fully and completely expressed in this Contract.

3. Intended Parents shall accept the legal and physical custody of any child born through this Agreement who is not genetically related to Surrogate or her Partner immediately upon birth regardless of number, gender, or mental or physical condition of child.

4. Intended Parents shall assume sole responsibility for the financial support of any child born through this Agreement who is not related to Surrogate or her Partner, immediately upon birth.

## XIV. LEGAL PARENTAGE

1. The Intended Parents shall have all parental rights, visitation rights, legal and physical custody rights of the Child immediately upon the Child's birth. The Surrogate and Surrogate's Husband agree to sign any legal and/or necessary documents in a timely manner to assist the Intended Parents establishing the parental rights between the Intended Parents and the Child in Nevada. The Surrogate and Surrogate's Husband warrant that they will cooperate with the



GC____GCH____ IF____IM____

Intended Parents, Agency, and/or her retained attorney for the parentage establishing procedure. The Surrogate and Surrogate's Husband agree to attend any court appearances if required by court to ensure the Intended Parents will be recognized as the Child's sole legal parents.

2. The Surrogate and Surrogate's Husband acknowledge that the Intended Parents shall have complete access to the Child while in hospital; the Intended Parents shall make all medical decisions for the Child; the Intended Parents' names shall be listed on the Child's birth certificate; the Intended Parents shall have the exclusive right to name the Child; the Intended Parents can take the Child home once the Child is discharged and the Intended Parents are responsible for all costs and fees for the Child after the Child's birth except as stated otherwise under this Contract.

3. The Intended Parents understand that they are financially responsible for all costs, bills, and expenses of the Child except as stated otherwise under this Contract. The Intended Parents intend to use cash to pay for the Child's costs, bill, and expenses if newborn insurance is not available to them.

4. The Surrogate agrees that, upon Intended Parents' request, she will fully cooperate in completing all forms and signing all documents as may be required in connection with the legal parentage establishment procedure in Nevada. The Surrogate agrees that she will fully cooperate with respect to obtaining any Court Order, Decree or judgment that may be necessary for Intended Parents to lawfully establish or confirm their legal parentage with respect to the Child and also for Intended Parents to be named as the Child's legal parents on the birth certificate.

## XV. INTENDED PARENTS' SEPARATION, INCAPACITY AND/OR DEATH

1. In the event the Intended Parents separate, the Child's parental and custody rights shall be decided by the Intended Parents or by a court judge with appropriate jurisdiction. Regardless of the Intended Parents' marital status, the Surrogate and Surrogate's Husband shall not have any parental, custodial, visitation or any other rights to the Child.

2. In the event one of the Intended Parents die before or after the Child's birth, the surviving Intended Parent shall have the parental and custody rights of the Child and the Surrogate and Surrogate's Husband shall relinquish any and all parental rights of the Child to the surviving Intended Parent.

3. In the event both the Intended Parents die, then the Intended Parents' appointed guardian shall have the custody rights of the Child immediately upon birth. The Intended Parents hereby appoint **Wenjun Xuan** as the Child's guardian under this circumstance and the guardian's contact cellphone number is (601)888-8888 and address is 11042 Lower Azusa Ave El Monte CA 91731Through his testamentary, the Intended Parents shall specify the responsibilities the guardian

shall have regarding the Child's care, support, and custody. The Surrogate shall not have any parental or custody right of the Child unless specified otherwise under this Contract and the Surrogate shall not make any medical decision for the Child after birth. If the Intended Parents die or are legally incapacitated before or after the Child's birth, this Contract shall be used to express Intended Parents' intention that Intended Parents be listed as the Parents of the Child(ren), and **Wenjun Xuan** be named as the Child's legal guardian.

## XVI. DETERMINATION OF PATERNITY AND MATERNITY

1. Both sets of Parties agree that the Surrogate and Surrogate's Husband are not the presumed parents of the Child. The Surrogate agrees that she is not the Child's genetic mother and she does not intend to establish a parent-child relationship with the Child. The Surrogate further agrees to cooperate with genetic testing between the Surrogate and the Child if either Party requests it. In the absence of clinical or medical error, if the Surrogate proves to be the genetic parent of the Child, it shall constitute as an incurable material breach of this Contract and the Surrogate shall be responsible for said material breach as stated herein this section as well as Section XXIV. Surrogate and her Partner shall not have breached this Agreement if, due to any act or omission of medical or laboratory personnel, she or her Partner is genetically related to a child born through this Agreement.

2. If the Intended Parents request a genetic testing to be done before the Child's birth, then both Parties shall mutually agree and select a medical professional to perform such genetic testing after the approval of the Surrogate's obstetrician, perinatologist or her treating medical professional.

3. In the event the genetic testing reveals that the Surrogate is the genetic mother of the Child, then the Surrogate shall have any and all parental, custodial and any other rights and obligations of the Child. The Surrogate shall be responsible for all costs, fees, and expenses related to the Child and the genetic testing fees once the Surrogate is proven to be the genetic mother of the Child and the Intended Parents shall no longer be financially and physically obligated to the Child.

## XVII. MEDICAL INSURANCE AND MEDICAL EXPENSES

1. The Surrogate currently has medical insurance with Ambetter to cover the pregnancy and delivery expenses contemplated in this Contract.

2. The Surrogate shall use her best efforts to ensure that the Medical Insurance is up-to-date and active throughout the period set forth in Paragraph 5 of this Section. **The Surrogate shall be liable only for the premium payments and charged deductibles of the Surrogate's Medical Insurance policy.** Intended Parents shall be responsible for all other insurance costs and uncovered



GC____GCH____ IF WX IM Sr

medical costs associated with the Surrogate's surrogacy, pregnancy, and delivery of the Child. The Intended Parents shall not be responsible for those medical expenses incurred for matters which are not reasonably necessary or appropriate as determined by the IVF Physician, or Obstetrician, or High-Risk Obstetrician, unless approved in writing by the Intended Parents. The Surrogate further understands and agrees that she shall be liable for any uncovered medical expenses not directly related to her performance of this Contract.

3. In the event that the Medical Insurance is terminated or canceled, the Intended Parents shall be responsible to obtain replacement coverage. The Surrogate shall continue to be responsible to pay the premiums and charged deductibles for the replacement coverage, but her payments will be limited to the amount she was paying or would have paid under the Ambetter policy with the Intended Parents paying all other amounts. In the event that the Surrogate negligently or intentionally caused the termination or cancellation of the health insurance policy, the Surrogate shall be in material breach of this Contract.

4. The Intended Parents are liable for any screening, embryo transfer and maternity care cost, expenses and other fees related to this Contract but are not covered by the Surrogate's Medical Insurance including but not limited to laboratory fees, blood tests, Surrogate's cycle medication, and anesthesiologist fees. Any medical examinations, tests, and procedures requested by the Intended Parents and/or the treating medical physician or requested by the Surrogate and is approved by the Intended Parents but not covered by the Surrogate's Medical Insurance shall be paid by the Intended Parents directly or paid from the Intended Parents' Escrow Account. In the event the Surrogate is requesting for any medical examinations, tests, and procedures and is not approved by the Intended Parents or the treating medical physician, the Surrogate shall not undergo such procedures and the Intended Parents shall not be responsible for such costs nor the Surrogate will receive any reimbursement related with not approved procedures.

5. The Medical Insurance shall remain in effect **sixty (60) calendar days** after the birth of the Child, a miscarriage or abortion, or upon termination of this Contract, whichever occurs first. However, if the surrogate suffers from complications within sixty (60) calendar days after the termination of this Contract, birth of the Child, miscarriage or abortion within sixty (60) calendar days, then the Surrogate's Medical Insurance shall remain effective for up to **ninety (90) calendar days** after the termination of this Contract, birth of the Child, miscarriage or abortion, and the Surrogate shall pay for said premiums during these time periods.

6. In no event shall the Intended Parents be responsible for the Surrogate's medical fees, costs, expenses incurred beyond sixty (60) calendar days after the termination of this Contract, the delivery of the Child, miscarriage, or abortion if there is no complication or ninety (90) calendar days if there is a complication after the termination of the Contract, the delivery of the Child, miscarriage, or abortion.



GC____GCH____ IF____IM____

7. The Intended Parents understand that it is their sole responsibility to review the Surrogate's Medical Insurance with an insurance professional as provided herein to ensure the coverage of the policy. The Intended Parents further understand that the Surrogate, retained legal counsels, and the Agency are not insurance professionals, and they cannot guarantee that the Surrogate's Medical Insurance will in fact cover the Surrogate's any and all medical expenses and related costs when acting as the Intended Parents' Surrogate. However, in no event are the Intended Parents to be considered as third-party payors.

8. The Surrogate shall submit all necessary documents to her Medical Insurance provider in a timely manner. The Surrogate shall notify the Agency and/or the Intended Parents if she receives any late payment notice, insurance cancellation notice or other notices that will majorly affect the Surrogate's insurance coverage for the Surrogate. If the Medical Insurance denies coverage for items related to the Surrogate's gestational pregnancy whether full or partial then the Surrogate as the insured party agrees to assist the Intended Parents in challenging any denial by the Medical Insurance provider upon Intended Parents and/or Intended Parents' legal counsel's request. Intended Parents shall be responsible for such legal fees, costs, and expenses related to challenging such disputes.

9. The Intended Parents and Surrogate acknowledge and assume the risks that the Surrogate's Medical Insurance may in fact not cover all fees, costs, and expenses related to the gestational pregnancy contemplated in this Contract.

10. The Surrogate's insurance shall be reviewed by a qualified Medical Insurance broker or agent in compliance with Nevada laws and the Intended Parents are responsible to pay for the fees and costs for Medical Insurance review. Both Parties understand that the reviewer's advice and opinion does not constitute legal advice.

11. The Parties understand the possibility that the Medical Insurance provider may change the Surrogate's insurance coverage or monthly premium and the Surrogate shall provide written notice to the Intended Parents and/or the Agency regarding such change in a timely manner.

12. It is both Parties' intent to use the Surrogate's Medical Insurance to cover the Surrogate's expenses and the Intended Parents will use the Child's health insurance, if any, or cash or credit card to pay for the Child's medical costs. The Surrogate's Medical Insurance is expected to cover the Surrogate's medical expenses throughout the pregnancy contemplated in this Contract.

13. The Intended Parents and Surrogate have been advised that a lien may be placed on the Surrogate's compensation by the medical insurance provider. It is understood and agreed that the Intended Parents are responsible for the payment of any lien taken against the Surrogate for



GC____GCH____ IF____IM____

medical expenses for the Surrogate's maternity care and treatment which directly relate to the conduct contemplated by this Contract. Intended Parents agree to deposit into the escrow account a sufficient amount of additional money to cover any lien with ten (10) business days of notice of the lien.

14. Surrogate and her Husband do not represent or warrant and Intended Parents specifically assume the risk that any existing Policy or Policy later obtained will, in fact, provide comprehensive maternity medical care and treatment for Surrogate for the medical treatment necessitated by this Agreement.

15. Intended Parents and Surrogate and her Husband understand that their Attorneys do not guarantee that any medical insurance purchased or existing for Surrogate will provide coverage or pay benefits to provide the medical care necessitated by this Agreement. Intended Parents and Surrogate understand that they were obligated to seek independent advice from an expert in the insurance industry.

16. Intended Parents have been advised that Surrogate's medical insurance does not apply to post-birth medical expenses for any child born pursuant to this agreement. Intended Parents will have sole legal, medical, and financial responsibility for all costs incurred by the child post-birth and have been advised to make arrangements to meet those responsibilities as soon as possible. Intended Parents and Surrogate understand that Surrogate shall not be responsible for the child's post-birth medical expenses and Surrogate's medical insurance Policy shall not be utilized to provide for the child's post-birth medical expenses.

## XVIII. LIFE INSURANCE POLICY

1. The Surrogate understands and agrees to pay the premium cost for a life insurance policy with **a face value of TWO HUNDRED AND FIFTY THOUSAND DOLLARS ($250,000.00)** on the Surrogate if she qualifies for such policy. The Surrogate shall be responsible to enroll herself with said life insurance policy with the help of Agency and shall ensure said life insurance policy remains in effect. In the event the Surrogate fails to obtain a Life Insurance Policy, her failure to do so shall constitute a legal excuse for the Intended Parents' failure to obtain a Life Insurance Policy for the Surrogate.

2. Said life insurance policy shall begin after the execution of this Contract and before the first Embryo Transfer Procedure and shall continue until three (3) months after the birth of the Child or termination of pregnancy. In the event the Surrogate has an ongoing medical complication caused by her obligations under this Contract, the Life Insurance Policy shall continue until said complication is resolved but under no circumstances shall coverage be paid for longer than three



GC____GCH____ IF____IM____

(3) months after the termination of this Contract, delivery or cessation of pregnancy, whichever occurs first.

3. The Surrogate's Husband, children, heirs, executors, assigns, and representatives agree that the Life Insurance Policy is adequate and complete consideration to the Surrogate from the Intended Parents for assuming the risks inherent to the performance and obligations of the Surrogate under this Contract. The Surrogate's Husband, children, heirs, executors, assigns and representatives, hereby waive and relinquish any and all rights, damages, claims, and demands against the Intended Parents which may accrue, arise, and/or result from the death of the Surrogate as a result of her participation in this Contract. Nothing in this provision shall be construed to limit the liability of any medical provider and/or professional for medical malpractice or negligence.

## XIX. LIFE SUPPORT

1. The Parties understand that in the event the Gestational Surrogate is seriously injured or suffers a life-threatening illness while pregnant as contemplated herein, if medically advised, the Surrogate will use life support equipment to maintain the fetus's viability and try to achieve a healthy and successful birth. All medical expenses incurred by the Gestational Surrogate pursuant to compliance with the foregoing provision not paid for by the Gestational Surrogate's medical insurance shall be the sole responsibility of the Intended Parents until the life support treatment concludes, the delivery of the child(ren), or the pregnancy is no longer viable, whichever occurs first.

## XX. ESCROW ACCOUNT

1. The Intended Parents have chosen **SeedTrust Escrow** located in West Palm Beach in Florida as their escrow manager (hereinafter "Escrow Holder") to set up an escrow account (hereinafter "Escrow Account") specifically for this Contract. The Intended Parents shall fund the Escrow Account according to this Contract's terms and provisions.

2. The Intended Parents shall deposit a minimum amount of **FIFTEEN THOUSAND DOLLARS ($15,000.00)** into the Escrow Account within ten (10) business days after the execution of this Contract, **SIXTY THOUSAND DOLLARS ($60,000.00)** no less than five (5) business days prior to the embryo transfer procedure, and **SIXTY THOUSAND DOLLARS ($60,000.00)** at ten (10) gestational weeks.

3. The Escrow Account shall maintain a minimum balance of **TEN THOUSAND DOLLARS ($10,000.00)** before the Escrow Account is closed as stated below. In the event the Escrow Account balance falls below the minimum balance, the Intended Parents shall deposit



GC____GCH____ IF____IM____

sufficient amounts into the Escrow Account within ten (10) business days to maintain the minimum balance.

4. Both Parties understand that the Escrow Account will not be closed until six (6) months after the Child's birth, miscarriage, termination of pregnancy, or termination of this Contract to ensure all bills are paid. Upon the Agency confirming all outstanding costs, fees, and expenses have been paid, the remaining balance in the Escrow Account shall be refunded to the Intended Parents.

5. If the medical insurance provider claims that it establishes a "lien" against the Surrogate's compensation as provided in the Exhibit "A" below, then the Intended Parents, shall deposit in the Escrow Account additional funds as determined by the Agency. This amount shall remain in the Escrow Account as a reserve until the lien or a reimbursement claim is settled (the "lien reserve"), and further the lien reserve shall not be used to pay any other fees, compensation, or expenses incurred by the Surrogate. In addition, the lien reserve shall not be included in any accounting relating to any other minimum balance the Intended Parents are required to maintain in the Escrow Account. This lien reserve shall be funded within ten (10) business days of the date it is established through a qualified medical insurance broker that the medical insurance provider claim that it establishes a "lien" against the Surrogate's compensation.

6. The Escrow Holder shall be responsible for making payments based on the terms and conditions of Exhibit "A" below.

**XXI. FUTURE CONTACT**

1. The Parties agree that the Surrogate and her family (if applicable) can spend up to one (1) hour with the Child in the hospital room after the Child's birth and before the Child is discharged from the hospital. The Intended Parents may facilitate the meeting and be present in the same room with the Child. The Parties understand that confidentiality as described herein does not contemplate speaking with friends, relatives, or other such persons about their own involvement in the gestational surrogacy arrangement so long as the full identity of the other Parties is not revealed. Such conversations are permitted and shall not constitute a breach of confidentiality, provided that the identity of, or other specific information about, the other party is not disclosed and nothing stated herein shall prevent any Party from discussing his/her involvement in surrogacy on social media or with any third party, so long as no information identifying a Party or the Child is provided.

2. Both Parties agree that for the best interest of the Child, the Surrogate and Surrogate's Husband shall not seek to visit or communicate with the Child without the Intended Parents' permission. The Parties agree that the Intended Parents may inform the Child about the Surrogate's



GC____GCH____ IF____IM____

participation in the Child's birth whenever the Intended Parents deem appropriate. The Parties agree that either Party is free to contact the other Party after the Child's birth unless one Party desires to cease such contact.

## XXII. CONFIDENTIALITY

1. Each Party acknowledges and agrees that without the permission of the other Party, one Party will not provide or disclose any identifying and personal information of the other Party in this Contract to any other person, the public, news media, and/or social media, etc.

2. In order to maintain the confidentiality contemplated in this Contract, if this Contract and/or the parentage order establishing the Intended Parents' parental rights lead to mediation and/or litigation, both Parties, their heirs, assigns and representatives agree to make every effort to maintain such confidentiality as this Contract is intended for the private use. Such action may include but not be limited to requiring all mediation and/or court records to be sealed, requiring the mediator and/or the court to keep the identities of both Parties confidential throughout the procedures and/or request the court to impose gag orders.

## XXIII. CHANGES IN CIRCUMSTANCES

1. In the event either Party has any material change to their circumstances after the execution of this Contract, that Party shall notify the other Party and/or the Agency immediately in writing and address any changes that may affect them to perform their obligations and responsibilities under this Contract. Such changes include but are not limited to change of contact information, exposure or diagnosis of an infectious disease, major injury, or death of a Party, change in marital status, change in employment status and/or change in Medical Insurance coverage.

## XXIV. MATERIAL BREACH

1. Before declaring one Party materially breached this Contract, the aggrieved non-breaching Party shall provide the alleged breaching Party with a written notice within a reasonable time after discovery of such breach and inform the alleged breach Party the details of the alleged breach. If the alleged breach of this Contract can be cured within a reasonable time, then the alleged breaching Party shall be given the opportunity to cure the alleged breach. If the alleged breach of this Contract cannot be cured or the alleged breaching Party fails to cure the alleged breach after given the opportunity, then alleged breaching Party shall be deemed to have materially breached this Contract.

2. In the event that any Party materially violates any of the provisions contained herein without a valid legal excuse, such violation shall constitute a material breach of this Contract, and



GC____GCH____ IF____IM____

in addition to all other remedies available at law or equity, this Contract may be terminated forthwith at the option of the aggrieved non-breaching Party without further liability on the part of the aggrieved non-breaching Party so long as the Surrogate is not currently pregnant. In the event the Surrogate is pregnant at the time a breach occurs, the rights and obligations of the Intended Parents with respect to the Child are not affected and shall continue in full force and effect and the waiver and relinquishment of all parental and legal rights by the Surrogate are not affected and shall continue in full force and effect.

3. In the event the Surrogate materially breaches this Contract, the Intended Parents are under no obligation to continue making payments to the Surrogate or reimburse any of the expenses incurred by the Surrogate. In addition, in the event of a material breach without legal excuse, which cannot be cured by Surrogate, the Surrogate shall reimburse the Intended Parents for all sums expended pursuant to this Contract at the time the breach was discovered. In the event the Intended Parents are found to be in material breach of this Contract without legal excuse, the Surrogate shall still receive all funds due to her pursuant to this Contract.

4. Regardless of whether the Intended Parents ceased paying the Surrogate due to a breach caused by negligent or willful conduct of the Surrogate, or a breach occurred due to the negligent or willful conduct of any Party, the Surrogate shall at all times continue to be responsible for attending all medical appointments and abiding by the terms of this Contract.

5. Any violation of the representations and/or warranties contained herein, or misrepresentations by a Party shall be considered as a material breach. In the event a material breach can be cured and is cured by the breaching Party, the aggrieved non-breaching Party's continued performance will constitute a waiver. The continued performance of the aggrieved non-breaching Party will not constitute a waiver if the breach is not cured.

6. Both Parties acknowledge and understand certain terms and provisions in this Contract such as custody of the Child and parental rights will not be affected even if this Contract is terminated due to breach or otherwise. The Parties agree that the Intended Parents are and will be the sole legal parents of the Child born pursuant to this Contract unless the Surrogate is genetically related to the Child.

7. In no event, shall any Party be deemed to have breached this Contract where the inability to perform timely or at all is due to a cause which is beyond the control of a Party to this Contract, such as death, natural disaster, a serious injury to any Party or an act of God.

//
//
//



GC____GCH____ IF____IM____

**XXV. RESOLUTION OF DISPUTE**

1. The Parties agree to undergo mediation for any dispute or claim arising out of this Contract before they proceed to arbitration or court action. A mediator shall be a neutral individual who has the authority to facilitate meetings for both Parties to reach a resolution regarding the dispute or claim but the mediator cannot impose a settlement on the Parties. Both Parties agree that they are equally responsible for the mediation fee. If any Party proceeds with arbitration or court action before undergoing or attempting to undergo mediation, then that Party shall not be entitled to recover attorney fees even if it would be available to the Party in other mediation or court action in addition to other remedies available at law or equity.

2. If the Parties fail to settle their dispute or claim through mediation then the Parties may begin an arbitration process to seek for a resolution if mutually agreed. The Parties agree to mutually choose an arbitrator for the arbitration process. The Parties will equally divide the arbitration fee and the prevailing Party will be entitled to recover arbitration fees, attorney fees, costs, and expenses related to the arbitration.

3. This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of Nevada. Any dispute or claim arising between the Parties related to the Child's custody or parental rights is not subject to mediation and arbitration and shall be preceded with an appropriate court with jurisdiction.

**XXVI. TERMINATION**

1. Subject to Section XXIV.7, either Party may choose to terminate this Contract as long as the Surrogate has not begun the injectable medication for embryo transfer procedure, is not waiting for the results of the embryo transfer procedure or is not pregnant. The Party shall provide a three (3) day written notice to the other Party if either Party chooses to terminate this Contract. In the event the IVF Physician deems the Surrogate is no longer medically suitable to act as the Intended Parent's gestational surrogate and the Surrogate is not then pregnant, the Intended Parent may choose to terminate this Contract after notifying the Surrogate in writing.

2. Upon such termination, the obligations of the Parties shall cease, except for the agreements set forth herein regarding the Parties' medical and mental health status, rights to any embryos, assumption of risk, dispute resolution, confidentiality, payment or reimbursement of any expenses incurred pursuant to the terms of this Contract by Surrogate and compensation owed by Intended Parents to Surrogate, which shall survive the termination of this Contract.

3. This Contract shall also automatically terminate under the following situations except that the Parties mutually agree to extend this Contract in writing: i) after three (3) failed embryo



GC____GCH____ IF____IM____

transfers ; ii) twelve (12) months after the Contract is signed, so long as the Surrogate is not pregnant, undergoing an embryo transfer cycle, or waiting the results of an embryo transfer cycle; iii) after a miscarriage or termination of pregnancy.

4. After the termination of this Contract pursuant to this Section, no Party shall have any further obligations or responsibilities pursuant to this Contract, except that the Intended Parents shall reimburse the Surrogate for any authorized expenses or other sums already incurred in the performance of her obligations or which are due under the Contract.

## XXVII. INDEPENDENT LEGAL COUNSEL

1. Both Parties acknowledge and understand that they have been advised to retain an independent legal counsel and consult with their legal counsel regarding any and all terms and provisions in this Contract.

2. By signing and executing this Contract, the Parties represent they have discussed their obligations, responsibilities, duties, conducts, rights, and liabilities contemplated in this Contract with their independent legal counsel.

## XXVIII. CONFLICT WAIVER

1. Both Parties understand that when an attorney of one Party is proposed, recommended or paid by the other Party, this creates a potential conflict of interest because the payment from the Intended Parents may induce the Surrogate and Surrogate's Husband's attorney to favor the Intended Parents instead of vigorously representing the Surrogate and Surrogate's Husband. To avoid this potential conflict, the Surrogate and Surrogate's Husband have the opportunity to consult with any other attorneys of their choice. After fully understanding these facts, the Surrogate and Surrogate's Husband have selected their current attorney to represent them and only represent their legal interests, not the interests of the Intended Parents, even if the Intended Parents will pay for their legal fees. By signing this Contract both Parties expressly agree to waive any conflict of interest that may be caused by the Intended Parents' payment of the Surrogate and Surrogate's Husband's legal fees and agree not to raise such potential conflict in any way.

## XXIX. PARTIES' INTENTIONS

1. The Parties intend for the Intended Parents to have a Child through the Surrogate's assistance and the Surrogate agrees to do her best to carry the Child to term and deliver a healthy Child for the Intended Parents.



GC____GCH____ IF____IM____

2. The Intended Parents intend to have a Child with the Surrogate's help through assisted reproductive technology.

3. The Parties agree that they do not intend for any conduct contemplated in this Contract be deemed as the Surrogate is donating her eggs, embryos, or genetic materials to the Intended Parents.

4. The Parties intend for the Intended Parents to make all decisions including major medical decisions for the Child both in the Surrogate's uterus (such decisions shall not seriously harm the Surrogate's health and safety or threaten the Surrogate's life) and after the Child's birth.

5. The Parties intend to keep the Surrogate safe and healthy throughout the pregnancy contemplated in this Contract. In the event the Surrogate's treating physician confirms that she is under great health risk or when she is suffering from life-threatening condition the Parties intend for the Surrogate to make all decisions affecting her own health.

6. The Parties understand that surrogacy is a relatively new area of law and it may change during this Contract and may affect their rights and obligations under this Contract, but nonetheless the Parties intend to be fully bound by the terms and provisions of this Contract.

7. The Parties intend for the Intended Parents to be the sole legal parent of the Child born pursuant this Contract. For the best interest of the Child, the Surrogate intends to cooperate with the Intended Parents for the establishing of parental rights between the Intended Parents and the Child with the appropriate court.

**XXX. AGENCY**

1. The Parties do not intend to and will not create any agency, partnership, employment, or joint venture.

**XXXI. TAXATION AND INSURANCE**

1. The Parties understand that the attorneys representing them in this Contract are not tax or insurance professionals and the attorneys have not offered them any advice regarding taxation and/or insurance. The Parties acknowledge that it is their sole responsibility to consult with independent professionals regarding tax and insurance matters that may relate with this Contract.

**XXXII. IMMIGRATION**

1. The Parties represent that the attorneys representing them in this Contract do not provide any immigration advice to them. If either Party needs legal advice regarding immigration law, it



GC____GCH____ IF____IM____

is that Party's sole responsibility to retain an independent immigration attorney and seek related advice.

**XXXIII. DISCLAIMERS**

1. Both Parties understand and acknowledge that the Agency, attorneys, IVF Physician, psychologist, and their staff members contemplated under this Contract cannot warrant or guarantee the result of the Embryo Transfer Procedure, the health of the Child, and whether either Party will abide with the terms and provisions of this Contract.

2. Both Parties understand and acknowledge that the Agency, attorneys, psychologist, and their staff members contemplated under this Contract are not responsible to give any medical advice to the Parties. The Parties acknowledge that it is their sole responsibility to consult with the IVF Physician, their own physician, or other independent medical professional regarding medical matters and risks related to this Contract.

**XXXIV. BINDING CONTRACT**

1. This Contract shall be binding upon the full execution of both Parties.

**XXXV. COUNTERPARTS**

1. This Contract will be executed in two parts or more and each of which shall be considered as an original. All parts shall be deemed to constitute one instrument. The Parties agree to use each Party's initial and signature in this Contract. An electronic, fax, or other copy of the executed copy shall be deemed as an original.

**XXXVI. INTEGRATED CONTRACT**

1. All previous and contemporaneous dialogues, negotiations, statements, covenants, consents, contracts and guarantees related to the conduct envisaged in this Contract are waived, merged, and replaced. This is an integrated Contract. If any previous or contemporaneous dialogues, negotiations, representations, covenants, consents, contracts and/or guarantees related to the contemplated conduct of this Contract are in conflict or inconsistent with the terms and provisions of this Contract, then this Contract shall prevail.

**XXXVII. NO SIMULTANEOUS NEGOTIATIONS**

1. The Surrogate and Surrogate's husband warrant that they are not in negotiation with any other Intended Parent(s) for gestational surrogacy arrangement at the same time they are

negotiating with the Intended Parents and they shall not attempt to enter into a surrogacy contract or engage in a surrogacy arrangement with any other Intended Parent(s) during this Contract.

## XXXVIII. INTERPRETATION

1. No terms and provisions of this Contract shall be subject to any Party or against any Party because that Party or the Party's attorney or agent drafted the terms and provisions.

## XXXIX. SEVERABILITY AND SURVIVAL

1. If any clause of this Contract, whether it is a sentence or an entire paragraph, is deemed invalid or unenforceable, it shall be deemed separated from the rest of this Contract. If the provision is deemed invalid because of its scope or breadth, it should be deemed valid within the scope or breadth permitted by law. The statement or representation given by any Party to this Contract and any right granted by any jurisdiction or enforceability terms and provisions and any risks assumed shall survive the termination of this Contract.

## XL. HEADINGS

1. The section headings contained in this Contract are for reference and convenience only and do not act as a part of this Contract. The headings shall have no effect on the meaning or interpretation of this Contract.

## XLI. TIME OF ESSENCE

1. For the obligation of the Parties to this Contract time is of the essence.

## XLII. GOVERNING LAW

1. This Contract shall be governed, interpreted and executed in accordance with Nevada law. The Parties also stipulated that this Contract shall be subject to the laws of Nevada. However, all Parties agree and understand that the principle of choice of law is a complex area of law. If a legal dispute arises, the judge, commissioner, mediator and/or arbitrator shall govern any future dispute over which state, federal, or international law. Both Parties are free to consult with other reproductive law attorneys before executing the Contract. The attorney makes no representations or warranties regarding the choice of law and/or jurisdiction.

2. All Parties submit to the jurisdiction of the courts of the State of Nevada for any legal action related to this Agreement and/or the parentage of the child born of this Agreement. The Parties agree that subject matter and personal jurisdiction shall be vested in and venue shall lie in a court of competent and appropriate jurisdiction within Nevada. Any arbitration proceeding shall be held within the State of Nevada.



GC____GCH____ IF____IM____

## XLIII. AMENDMENT

1. This Contract shall be amended only when both Parties sign a written addendum.

## XLIV. TRANSLATION

Should this Agreement be translated into another language, this English version shall control. The Parties agree that the attorneys drafting and reviewing the Agreement are not responsible for any errors in the translated version.

## XIV. ATTORNEYS' FEES AND COSTS

In the event litigation is required to interpret or enforce the terms of this Agreement in a court of competent jurisdiction, the prevailing party shall be entitled to reasonable attorneys' fees, court costs, and to any other relief which the court determines.

## XLVI. NOTICE

1. Any and all written notice to be served pursuant to this Contract shall be considered served on the day delivered. Either Party shall serve the other Party in ways including but not limited to by personal delivery, by email, mail with courier service such as Federal Express, UPS, DHL, or U.S. Mail.

**If to the Intended Parents:**

Guojun Xuan and Silvia Shasha Zhang
Address: 612 W Camino Real Ave, Arcadia, CA 91007
Phone: 626-955-2666

**With a copy to:**

Lei Bai, Esq.
Law Offices of Lei, APC
Address: 1 Park Plaza. Suite 360. Irvine, CA 92614
Email: Lei@bllaws.com

**If to the Surrogate and Surrogate's Husband:**

Tronderrica Rogers James and Travis Travell James
Address: 2675 Windmill Pkwy., Apt 3221, Henderson, NV 89074
Email: mrstronjames@gmail.com



GC____GCH____ IF____IM____

Phone: (318)759-9557

**With a copy to:**
Eric A. Stovall, Esq.
Eric A. Stovall, Ltd
Address: 200 Ridge St #222, Reno, NV 89501
Email: diane@ericstovalllaw.com

**If to the Agency, the Intended Parents or the Surrogate and Surrogate's Husband:**

Mark Surrogacy
Address: 10505 Valley Blvd. El Monte, CA 91731
Email: info@marksurrogacy.com
Phone: 626-233-7581

**XLV. SIGNATURES**

1. By signing this Contract, the Parties represent that they have reviewed this Contract with their legal counsels and agree to the terms and provisions in this Contract. The Parties warrant that they will not execute or attempt to execute any other documents or contracts conflict with the terms and provisions contained herein. If any Party executes a document or contract conflicts with any and all terms and provisions contained herein, the Parties hereby agree that this Contract shall supersede all other documents or contracts.

2.

**XLVII. FREE AND VOLUNTARY EXECUTION**

1. Both Parties acknowledge that they fully understand this Contract and its legal effect. The Parties are signing this Contract freely and voluntarily without any coercion. No Party shall have any reason to believe that any Party executed this Contract not freely or involuntarily.

**[Signature page follows]**



GC____GCH____ IF____IM____

**In witness whereof, the Parties have executed this Contract as of the date indicated below.**

**The Parties must sign this Contract before a notary public.**

3/25/2024
Date

GUOJUN XUAN
Intended Father's Print Name

Intended Father's Signature

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES
SUBSCRIBED and SWORN to before me this 25th day of March, 2024 by Guojun Xuan.

JESSICA WONG
COMM. #2474432
Notary Public - California
Los Angeles County
My Comm. Expires Dec. 24, 2027
NRO1

NOTARY PUBLIC

3/25/2024
Date

SILVIA ZHANG
Intended Mother's Print Name

Intended Mother's Signature

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES
SUBSCRIBED and SWORN to before me this 25th day of March 2024 by Silvia Shasha Zhang.

JESSICA WONG
COMM. #2474432
Notary Public - California
Los Angeles County
My Comm. Expires Dec. 24, 2027
NRO1

NOTARY PUBLIC



GC____GCH____ IF____IM____

______________ Date

________________________________ Gestational Surrogate's Print Name

________________________________ Gestational Surrogate's Signature

STATE OF ____________________
COUNTY OF __________________
SUBSCRIBED and SWORN to before me this ___ day of _____, 2024 by Tronderrica Rogers James.

________________________
NOTARY PUBLIC

______________ Date

________________________________ Surrogate's Husband's Print Name

________________________________ Surrogate's Husband's Signature

STATE OF ____________________
COUNTY OF __________________
SUBSCRIBED and SWORN to before me this ___ day of _____, 2024 by Travis Travell James.

________________________
NOTARY PUBLIC



GC____GCH____ IF_[initials]_IM_[initials]_

ACKNOWLEDGEMENT OF
INTENDED PARENTS

We, Guojun Xuan and Silvia Shasha Zhang, have thoroughly reviewed the final draft of this Agreement and have received information about the legal, financial and contractual rights, expectations, penalties and obligations of this Agreement. We have a full and complete understanding of all our legal rights and duties under the terms of this Agreement.

Dated: 3/25/2024 ____________________
Guojun Xuan

Dated: 3/25/2024 ____________________
Silvia Shasha Zhang

*This space intentionally is blank*

ACKNOWLEDGEMENT OF
GESTATIONAL SURROGATE and PARTNER

We, Tronderrica Rogers James and Travis Travell James , have thoroughly reviewed the final draft of this Agreement and have received information about the legal, financial and contractual rights, expectations, penalties and obligations of this Agreement. We have a full and complete understanding of all of my legal rights and duties under the terms of this Agreement.

Dated:__________________ ________________________
Tronderrica Rogers James

Dated:__________________ ________________________
Travis Travell James

*This space intentionally is blank*



GC____GCH____ IF____IM____

DECLARATION OF ATTORNEY
FOR GESTATIONAL SURROGATE and PARTNER

I am an attorney duly licensed to practice law in the State of Nevada. I am the attorney for Surrogate Tronderrica Rogers James and Travis Travell James.

The Gestational Carrier agreement is in compliance with Nevada Law.

Surrogate and Partner agreed to the terms of the Gestational Carrier Agreement and in my opinion understands the legal effects.

I declare under penalty of perjury of the laws of the State of Nevada that the foregoing is true and correct.

Dated:__________________

________________________________
Eric A. Stovall, Esq. (Attorney for Surrogate and Partner)



GC____GCH____ IF____IM____

DECLARATION OF ATTORNEY
FOR INTENDED PARENTS

I am an attorney duly licensed to practice law in the State of California. I am the attorney for Intended Parents Guojun Xuan and Silvia Shasha Zhang herein.

The Gestational Carrier agreement is in compliance with California Law.

Intended Parents agreed to the terms of the Gestational Carrier Agreement and in my opinion understand the legal effects.

I declare under penalty of perjury of the laws of the State of _California that the foregoing is true and correct.

Dated:____________________

______________________________
Lei Bai, Esq. (Attorney for Intended Parents)



GC____GCH____ IF____IM____

**EXHIBIT "A"**

All payments as set forth in this Exhibit "A" shall be deposited by the Intended Parents into the Escrow Account and then shall be paid to the Surrogate from the Escrow Account. All payments due on the first of the month under this Contract shall be paid within five (5) business days. All other payments not due on the first of the month shall be paid to the Surrogate within five (5) business days after the date for which the payment is due.

## I. COMPENSATION FOR PREGNANCY

1. The Surrogate will be compensated for her pain, sufferings, discomfort, inconveniences during her pregnancy and any reasonable post-birth expenses during the period of this Contract at a total amount of **ONE HUNDRED AND THIRTY-FIVE THOUSAND DOLLARS ($135,000.00)**. After confirmed fetal heartbeat and as long as the Surrogate is pregnant as contemplated in this Contract, she shall be entitled to receive **THIRTEEN THOUSAND FIVE HUNDRED DOLLARS ($13,500.00)** per month beginning on the first day of the month following the confirmed heartbeat and shall continue every month thereafter. The Surrogate shall be entitled to receive the remaining balance of **ONE HUNDRED AND THIRTY-FIVE THOUSAND DOLLARS ($135,000.00)** within fourteen (14) days after she delivers the Child. All compensations and reimbursements are subject to the following restrictions set forth below:

A. Should the Surrogate give birth beginning thirty-six (36) weeks zero (0) days (or thirty (30) weeks zero (0) days for multiples) of gestational pregnancy, Surrogate will be entitled to receive the remaining balance of the **ONE HUNDRED AND THIRTY-FIVE THOUSAND DOLLARS ($135,000.00)** within fourteen (14) days of the birth, even if such Child is not born alive or does not survive the hospital stay at the time of the birth.

B. Should the Surrogate, however, give birth sooner than thirty-six (36) weeks zero (0) days (thirty (30) weeks zero (0) days for multiples) from the date of the embryo transfer, the Surrogate will only be entitled to receive the remaining balance of the **ONE HUNDRED AND THIRTY-FIVE THOUSAND DOLLARS ($135,000.00)** within fourteen (14) days of the child being discharged from the hospital into Intended Parents' care. If such Child is stillborn or does not survive before being discharged into Intended Parents' care, the Surrogate shall be entitled to the payments already received or due to her under this Section.

C. The Parties agree that payment to the Surrogate of a lump sum upon the child reaching the "well-baby" nursery or discharged from the hospital is intended to ensure that the Surrogate is paid in full for her assistance in the event of a premature birth. Further, the payment schedule is intended to ensure that the Surrogate is not penalized for agreeing to a procedure that is in the best



GC____GCH____ IF____IM____

interests of the child, such as inducing labor before the pregnancy has gone full term or agreeing to a cesarean section.

D. Should a miscarriage or a physician-recommended abortion occur, or should the Child not survive to be discharged from the hospital or into a well-baby unit, the Surrogate shall be entitled to the payments already received or due to her under this Section.

E. The Surrogate is entitled to receive **FIVE HUNDRED DOLLARS ($500.00)** instead of the first monthly base compensation if there is a positive HCG test, but no fetal heartbeat detected by ultrasound, or a miscarriage should occur prior to the Surrogate receiving her first payment.

F. The first month of payment to base compensation shall be **EIGHT THOUSAND SEVEN HUNDRED DOLLARS ($8,700.00)**, as deducted by **ONE THOUSAND DOLLARS ($1,000.00)** for having received sign-on bonus, **FIVE HUNDRED DOLLARS ($500.00)** for having received injectable medication start fee, **ONE THOUSAND AND FIVE HUNDRED ($1, 500.00)** for embryo transfer fee and **ONE THOUSAND EIGHT HUNDRED DOLLARS ($1,800.00)** for attorney fees.

**II. BONUSES**

1. **CONTRACT SIGNING BONUS.** The Surrogate is entitled to receive a non-accountable contract signing bonus in the amount of **ONE THOUSAND DOLLARS ($1,000.00)**, which will be deducted from the first month's base compensation. The Agency may withhold this payment until the Surrogate returns her executed Agreement to her attorney. The contract signing bonus will be deducted from the first month's base compensation.

**III. SPECIAL FEES**

1. **INJECTABLE MEDICATION START FEE.** The Surrogate shall receive **FIVE HUNDRED DOLLARS ($500.00)** for a medication start fee within five (5) business days after starting injectable cycle medication (not including birth control pills) for each Embryo Transfer Procedure. Due to the start of every cycle, even if the prior cycle was canceled. This fee does not apply to a mock cycle; the Surrogate will be compensated separately if mock cycle is required. If the IVF Clinic recommends restarting medication due to the assessment that the Surrogate has not adhered to the medication instructions as required, the Surrogate shall not be eligible for the $500.00 medication start fee for that cycle and she shall return the $500.00 Medication Start Fee if she has received already. The medication start fee will be deducted from the first month's base compensation.



GC____GCH____ IF____IM____

2. **EMBRYO TRANSFER FEE.** The Surrogate shall receive an additional non-accountable **ONE THOUSAND FIVE HUNDRED DOLLARS ($1,500.00)** after each Embryo Transfer Procedure regardless of the outcome of the transfer and the number of embryos being transferred. Such payment will be paid within ten (10) business days from the day the Surrogate completes the Embryo Transfer Procedure. The embryo transfer fee will be deducted from the first month's base compensation.

## IV. ATTORNEY FEES

1. The Intended Parents shall pay for the Surrogate's attorney fees incurred in relation with the review of this Contract with an independent attorney, but the Intended Parents shall not be responsible for the Surrogate's attorney fee for advice regarding breach or enforcement of this Contract. The Intended Parents shall also be responsible for the Surrogate's attorney fee in relation to establishing the parental rights between the Intended Parents and the Child born pursuant to this Contract.



GC____GCH____ IF_[initials]_IM_[initials]_